Michael WALLACK, Esq., As Indenture Trustee and Disbursing Agent, Dealer Leasing & Sales, Inc. A Dissolved Florida Corporation and Louis Spiro, Plaintiffs,

v.

WORLDWIDE MACHINERY SALES, INC., A Mississippi Corporation, and Randy Braswell, individually, Defendants.

No. 8:00–CV–275–T–23EAJ.

United States District Court,
M.D. Florida,
Tampa Division.

July 28, 2003.

Donald J. Schutz, Schutz & Schutz, St. Petersburg, for Michael Wallack, as Indenture Trustee and Disbursing Agent, Dealer Leasing & Sales, Inc., a dissolved Florida corporation, Louis Spiro, plaintiffs.

Robert B. Gough, III, Hill, Ward & Henderson, P.A., Tampa, Michael S. Pasano, Walter J. Tache, Zuckerman, Spaeder, Taylor & Evans, Miami, for Worldwide Machinery Sales, Inc., a Mississippi corporation, Randy Braswell, individually, defendants.

### *ORDER*

MERRYDAY, District Judge.

The Court referred (Doc. 50) (1) the defendants' motion to dismiss the amended complaint (Doc. 8), (2) the plaintiffs' motion for partial summary judgment (Doc. 34), and (3) the defendants' motion to strike (Doc. 37) to United States Magistrate Judge Elizabeth A. Jenkins for a report and recommendation. On July 2, 2003, the Magistrate Judge issued a report and recommendation (Doc. 68), to which no party objects. The Magistrate Judge's report and recommendation (Doc. 68) is **ADOPTED.** Accordingly, the defendants motion to dismiss (Doc. 8) is **GRANTED**. The plaintiffs' motion for partial summary judgment (Doc. 34) and the defendants' motion to strike (Doc. 37) are **DENIED AS MOOT.** The Clerk is directed to (1) terminate any pending motion and (2) close the file.

### *REPORT AND RECOMMENDATION*

JENKINS, United States Magistrate Judge.

Before the court are Defendants' Motion To Dismiss Amended Complaint And Incorporated Memorandum of Law (Dkt.8); Plaintiffs' Response To Defendants' Motion To Dismiss Amended Complaint (Dkt.10); Defendants' Reply In Support Of Motion To Dismiss Amended Complaint (Dkt.24); Plaintiffs' Motion For Partial Summary Judgment On Count One As To Defendant Worldwide Machinery Sales, Inc. (Dkt.34); Plaintiffs' Memorandum Of Law In Support Of Motion For Summary Judgment On Count One Of Amended Complaint (Dkt.35); Defendant Worldwide Machinery Sales, Inc.'s Motion To Strike Portions Of Plaintiff Louis Spiro's Affidavit In Support of Plaintiffs' Motion For Partial Summary Judgment (Dkt.37); Defendant Worldwide's Memorandum Of Law In Opposition To Plaintiffs' Motion For Partial Summary Judgment (Dkt.38); Plaintiffs' Response To Motion of Defendants To Strike Paragraphs 3, 7, 8, of Affidavit Of Louis Spiro (Dkt.42); and notices of filing supplemental authority and affidavits submitted by the parties.[1] A hearing on the motions was conducted on June 3, 2003.

### I. PROCEDURAL BACKGROUND

This action commenced on February 11, 2000, and arises under this court's diversity jurisdiction.

The amended complaint filed by Plaintiffs, Michael Wallack, Esq., as Indenture Trustee and Disbursing Agent for Dealer Leasing & Sales, Inc. ("DLS"), a dissolved

---

**1.** This matter has been referred to the undersigned by the district court for consideration and a Report and Recommendation. *See* Local Rules 6.01(b) and 6.01(c), M.D. Fla.

Florida corporation, and Louis Spiro ("Spiro"), states claims against Defendants Worldwide Machinery Sales, Inc. ("Worldwide") and Worldwide's principal Randy Braswell ("Braswell") for breach of contract, fraudulent inducement, negligent misrepresentation, alternatively for quantum meruit/unjust enrichment, breach of an express warranty, and declaratory judgment (Dkt.7).

Defendants seek to dismiss Plaintiffs' amended complaint on the basis that this court lacks personal jurisdiction over Defendants pursuant to Fed.R.Civ.P. 12(b)(2)(Dkt.8). Defendants also contend that several of the counts in Plaintiffs' amended complaint fail to state a cause of action and should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6). Defendants argue that Plaintiffs' claims for fraudulent inducement, negligent misrepresentation and quantum meruit/unjust enrichment are barred by the applicable statute of limitations. Defendants argue that Plaintiffs' claims for fraudulent inducement and negligent misrepresentation are also barred by the economic loss rule. Defendants also allege that Plaintiffs' claim for quantum meruit/unjust enrichment fails because there is a valid enforceable contract that is the subject of the dispute. Defendants additionally argue that Plaintiffs' claim for declaratory judgment is improper. Finally, Defendants contend that Plaintiffs lack standing to sue on the claims asserted.

Plaintiffs move for partial summary judgment in their favor against Worldwide on the first count of Plaintiffs' complaint for breach of contract (Dkt.34). Defendants counter and move to strike portions of Plaintiff Louis Spiro's affidavit in support of Plaintiffs' motion for partial summary judgment (Dkt.37).

The threshold issue is whether personal jurisdiction exists over Defendants. The parties presented testimony on this issue at the hearing on June 3, 2003. The court has considered the testimony presented together with the declarations and affidavits submitted by the parties.

## II. FACTUAL BACKGROUND

### A. Facts Relating To Personal Jurisdiction

Defendant Worldwide's primary place of business was Magnolia, Mississippi, although it is now an "inactive" Mississippi corporation. Defendant Braswell, the former president of Worldwide from its inception, is a resident of Magnolia, Mississippi. Braswell, as president, was involved in the day to day operations of Worldwide.

Worldwide was an active Mississippi corporation from 1980–1981 through 1997. Worldwide, in the regular course of its business, purchased machinery, much of it outside the state of Mississippi. Worldwide may have purchased equipment or machinery within Florida unrelated to this dispute, although Braswell could not recall a specific purchase or sale in Florida. Braswell, on behalf of Worldwide, recalled attending two auctions in Florida, one in Ocala, Florida, and another in Kissimmee, Florida. Worldwide did not purchase equipment at the Ocala auction but it is possible that an employee of Worldwide purchased a piece of equipment at the Kissimmee auction.

In 1993, Worldwide purchased 71 Mahindra Jeeps ("Jeeps") from Zeus International Trade Agency, Ltd, located in Middlesex, United Kingdom. At the time of purchase, the Jeeps were located in a private storage facility in Houston, Texas, and were under the control of the United States Customs Service ("U.S.Customs"). U.S. Customs had not cleared the Jeeps for entry into the United States.

Worldwide originally purchased the Jeeps to resell them for "off-road" use.

Worldwide later learned that the Jeeps could only be resold for export. U.S. Customs filed a forfeiture complaint on August 22, 1995, and subsequently issued a warrant for arrest in rem for the Jeeps. The Jeeps were later relocated to New Orleans, Louisiana.

In 1995, Worldwide filed a petition with U.S. Customs seeking the return of the Jeeps and asserting its ignorance of the customs laws and its willingness to cooperate with the restriction that the vehicles be resold for export only. U.S. Customs agreed to release the Jeeps to Worldwide for export only after payment of a fine of $28,400 and accrued storage costs. Worldwide disputed the requirement that it pay storage costs and U.S. Customs began civil forfeiture proceedings against the Jeeps.

Plaintiff Spiro testified that he learned of the Jeeps from three or four potential buyers, but, at that time, he did not know who owned the Jeeps. Subsequently, Spiro stated that a friend who met Braswell at an auction in Ocala, Florida, learned that he owned the Mahindra Jeeps, and provided Braswell's name and telephone number to Spiro. It is undisputed that Spiro, on behalf of DLS, initially contacted Worldwide through Braswell.

DLS is a dissolved Florida corporation and Spiro is the sole existing director. Michael Wallack ("Wallack") is the Indenture Trustee and Disbursing Agent of the assets of DLS, allegedly pursuant to an Assignment and Judgment.[2]

Spiro represented to Braswell that he was familiar with the importation and exportation of vehicles and that DLS was interested in purchasing the seized Jeeps. Braswell testified that he informed Spiro that the vehicles were being held in storage in New Orleans, Louisiana, were incurring storage costs, and were subject to a pending forfeiture action by U.S. Customs.

To effectuate the sale of the Jeeps from Worldwide to DLS, Braswell drafted a Buy–Sell Agreement.[3] Braswell executed

2. Plaintiffs have not attached a copy of the assignment to the amended complaint.

3. The Buy–Sell Agreement provides:

Seller is the lawful owner of the attached list of (71) Mahindra Jeeps, and has full right to sell and transfer same to buyer under the following terms and conditions to wit:

1. The receipt of $355,000 in U.S.A. currency from buyer.
2. The approval of the U.S. Customs agency for this transaction to close.
3. The approval of sellers [sic] attorney, Timothy, Allison Meche, that all documents and transfers are proper and legal.
4. The units are guaranteed to buyer to be free and clear of all liens or encumbrances at the time of closing. However, all units are sold to the buyer in as is, where is, condition. Removal and transportation of the units are the responsibility of buyer.
5. Upon the occurrence of terms 1, 2, and 3, seller will assign all certificates of origin and bills of sale necessary to convey title (It is agreed that these assignments shall meet the approval of buyers [sic] counsel, Mr. Michael Wallack.)

6. This agreement is made in a good faith effort to set forth the terms under which the sale of (71) Mahindra Jeeps can be accomplished. Seller, however, reserves the right to remain free to offer the units for sale on a first come basis until such time as payment in the amount of $355,000 is received from buyer. Seller agrees to notify buyer and give buyer first option to purchase the units at the agreed price for a period of ten days from the date of this agreement. If after ten days a closing and full payment has not been accomplished, then seller will have no further obligation to buyer under this agreement.

Buyer agrees to purchase the (71) Mahindra Jeeps described in the attached list for the sum of $355,000.00 cash at closing, under the terms and conditions as set forth in this Buy–Sell Agreement.

(Dkt. 7, Exhibit A)

the Buy–Sell Agreement in Mississippi on behalf of Worldwide and sent it by facsimile to Spiro in Florida. Spiro executed the Buy–Sell Agreement in Florida on behalf of DLS.

The Buy–Sell Agreement, dated January 26, 1996, identifies DLS as the agent for Hedor CC Limited for the purchase of the Jeeps. Braswell testified that at the time the Buy–Sell Agreement was executed, the parties understood that time was of the essence since the Jeeps were continuing to accrue storage costs. It is undisputed that the parties understood that storage costs for the Jeeps accrued prior to February 29, 1996, were to be paid by Worldwide, and storage costs accrued after February 29, 1996, would be bourne by DLS. It is similarly undisputed that the Jeeps could leave the U.S. Customs' storage facility only if they were being exported and appropriate documentation demonstrating their exportation was presented to U.S. Customs.

Worldwide negotiated with U.S. Customs to pay storage costs for the Jeeps through February 29, 1996, in the amount of $110,000, and to have the Jeeps removed from the storage facility upon verifiable documentation that the Jeeps would be exported outside of the United States.

Braswell testified that the settlement amount for storage and the terms of the agreement with U.S. Customs were not finalized until February 1996, after the Buy–Sell Agreement was executed. On the other hand, Spiro testified that he was told by Braswell that the settlement terms with U.S. Customs were finalized prior to the execution of the Buy–Sell Agreement. Specifically, Spiro stated that he was told by Braswell before he executed the Buy–Sell Agreement that U.S. Customs was to be paid $110,000 for storage, and that amount would be paid by Worldwide from the purchase price of the Jeeps. Spiro stated that he requested that the purchase price not reflect the $110,000 in storage costs, but this request was rejected by Worldwide.

Spiro also asserted that he was falsely told that the Jeeps were free and clear of all liens; that Worldwide had an enforceable agreement with U.S. Customs as to the accrued storage fees; and the contract between DLS and Worldwide was contingent upon approval by U.S. Customs. These alleged false statements comprise the basis for Plaintiffs' claims for fraudulent inducement and negligent misrepresentation.

Prior to and after entering into the Buy–Sell Agreement, it is undisputed that Braswell, in Mississippi, and Spiro, in Florida, spoke by telephone on numerous occasions. Spiro stated that the number of telephone calls between him and Braswell were "infinite". Braswell also agreed that he spoke with Spiro on many occasions by telephone although he asserted that Spiro usually spoke with Timothy Meche, the attorney hired by Worldwide to represent it before U.S. Customs. Spiro stated that while he initiated the first call to Braswell, thereafter, Braswell initiated as many calls to Spiro as Spiro initiated to him. Braswell stated that Spiro initiated the majority of the telephone calls between Braswell and him.

Braswell never met with Spiro in Florida. However, Braswell, acting on behalf of Worldwide, sent Spiro, in Florida, a master bill of sale, the Buy–Sell Agreement, certificates of origin for each Jeep, and various supporting documents, such as updates on the dispute with U.S. Customs.

### B. Facts Subsequent to Formation of Contract

Pursuant to the agreement to purchase the Jeeps, DLS forwarded checks to Worldwide totaling $355,000 in February 1996; however, all but $10,000 of this

amount was initially returned for insufficient funds. Nevertheless, on February 14, 1996, Worldwide transferred title of the Jeeps to DLS by sending a Master Certificate of Title to DLS in Florida. As of February 29, 1996, however, the date negotiated for the removal of the vehicles from the U.S. Customs' storage facility, DLS had failed to provide funds sufficient to cover the bad checks and had not obtained the required documentation demonstrating that the Jeeps were to be exported. Thus, Worldwide did not pay U.S. Customs the storage costs accrued through that date, and U.S. Customs did not release the Jeeps to DLS.

Braswell asserted that DLS did not make full payment for the Jeeps until October 1996. Spiro stated that DLS re-sent checks to Worldwide that were honored in April 1996 and DLS sent Worldwide an additional $10,000 because of the inconvenience of the insufficient checks.

According to Spiro, DLS did not remove the vehicles from New Orleans, Louisiana as agreed by February 29, 1996, because it did not have a buyer at that time. Therefore, DLS was not able to present documentation to U.S. Customs to demonstrate that the vehicles would be imported.

In the months following February 29, 1996, Braswell asserted that Worldwide stood ready to perform its obligations. Worldwide's counsel secured two extensions of time on DLS' behalf. However, DLS neither presented appropriate documentation demonstrating the Jeeps' exportation within those time periods, nor did DLS tender payment to U.S. Customs for storage costs accrued after February 29, 1996.

The Jeeps were eventually forfeited to U.S. Customs in October 1996. The U.S. Customs' sale resulted in Spiro, on behalf of DLS, being high bidder of the Jeeps for $175,000, according to Spiro. Spiro asserted that he telephoned Braswell both prior to and after the U.S. Customs' sale to request that Worldwide pay to him the $110,000 in storage charges owed to U.S. Customs. Braswell denied receiving these telephone calls and denied any knowledge that DLS was the high bidder for the Jeeps. However, it is undisputed that Worldwide never paid U.S. Customs $110,000 for storage costs accrued prior to February 29, 1996.

## III. DISCUSSION

■ When a defendant moves to dismiss a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) and for lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2), the court should address the personal jurisdiction question first. *Madara v. Hall,* 916 F.2d 1510, 1513–14 (11th Cir. 1990).

### A. Personal Jurisdiction

■ The plaintiff is required to plead sufficient material facts to form a basis for in personam jurisdiction. Once the plaintiff meets this burden, the burden shifts to the defendant to challenge the plaintiff's complaint by affidavits or other pleading. *Hollingsworth v. Iwerks Entertainment, Inc.,* 947 F.Supp. 473, 476 (M.D.Fla.1996) (citations omitted). The court must accept the facts alleged in the complaint as true to the extent they are uncontroverted by the defendant's affidavits. *Morris v. SSE, Inc.,* 843 F.2d 489, 492 (11th Cir.1988). If the defendant sufficiently challenges the plaintiff's jurisdictional allegations, the plaintiff must affirmatively support his jurisdictional allegations set forth in the complaint. *Hollingsworth,* 947 F.Supp. at 476.

However, where the plaintiff's complaint and the defendant's affidavits conflict, the court must construe all reasonable inferences in favor of the plaintiff. *Morris,* 843 F.2d at 492. If "the relevant facts set

forth in the respective affidavits are in direct conflict," the court may hold an evidentiary hearing on the issue of jurisdiction. *Venetian Salami Co. v. Parthenais,* 554 So.2d 499, 503 (Fla.1989).

The parties presented testimony on personal jurisdiction at the June 3, 2003, hearing. The court has considered that testimony together with the affidavits and declarations filed in support of the parties' positions.

Plaintiffs, in establishing personal jurisdiction over Defendants, must satisfy both Florida's long-arm jurisdictional statute, Fla. Stat. § 48.193, and constitutional notions of due process. *See Madara,* 916 F.2d at 1514.

First, the court considers the jurisdictional question under the state long-arm statute. *Cable/Home Communication Corp. v. Network Productions, Inc.,* 902 F.2d 829, 855 (11th Cir.1990). If there is a basis for assertion of personal jurisdiction under the state statute, the court next determines whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Madara,* 916 F.2d at 1514 (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct.

154, 90 L.Ed. 95 (1945))(remaining citations omitted). Only if both prongs are satisfied may the court exercise personal jurisdiction over a non-resident defendant.

### 1. Florida Long–Arm Jurisdiction

Federal courts are required to construe the Florida long-arm statute as would the Florida Supreme Court. *Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.,* 701 F.2d 889, 890–91 (11th Cir.1983). To obtain jurisdiction over a non-resident defendant consistent with Florida's long-arm statute, Fla Stat. § 48.193 [4], a plaintiff must allege specific, ultimate facts that bring the action within the ambit of the applicable long-arm statute. *See John Posey Corp. v. R.J.T. Engineering, Inc.,* 617 So.2d 441, 443 (Fla. 5th DCA 1993); *Miller v. Braunstein,* 549 So.2d 797 (Fla. 5th DCA 1989). Plaintiffs bear the burden of alleging sufficient facts to establish the application of the long-arm statute. *See Taylor Forge International, Inc. v. Specialty Maintenance & Construction, Inc.,* 685 So.2d 1360, 1361 (Fla. 2nd DCA 1996).

Section 48.193(2), Fla. Stat., addresses the court's ability to exercise general jurisdiction over a non-resident defendant. There are two types of personal jurisdiction: specific and general. General per-

---

4. Section 48.193 provides in pertinent part:

Acts subjecting person to jurisdiction of courts of state

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

. . .

(b) Committing a tortious act within this state.

. . .

(f) Causing injury to persons or property within this state arising out of an act or omission by the defendant outside of this state, if, at or about the time of the injury, either:

1. The defendant was engaged in solicitation or service activities within this state: or

2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

(g) Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.

Fla. Stat. § 48.193 (2003).

sonal jurisdiction arises from a party's contacts with the forum state that are unrelated to the litigation. *Madara,* 916 F.2d at 1516 n. 7 (citation omitted). Fla. Stat. § 48.193(2) provides that a defendant who is engaged in substantial and not isolated activity within Florida is subject to jurisdiction in Florida whether or not the claim asserted arises from that activity.

There are no facts alleged that would demonstrate that either Worldwide or Braswell engaged in substantial activity in Florida.

Section 48.193(1) addresses specific jurisdiction, permitting jurisdiction over non-resident defendants who engage in certain enumerated acts. *L.O.T.I. Group Productions v. Lund,* 907 F.Supp. 1528, 1531 (S.D.Fla.1995).

Section 48.193(1)(a) authorizes personal jurisdiction over persons operating, conducting, engaging in, or carrying on a business or business venture in Florida or having an office or agency in Florida. Defendants argue that preparing a contract in Mississippi, executing it in Mississippi, and faxing it to DLS in Florida for execution in Florida does not amount to soliciting business or doing business in Florida. In support, Defendants point to the contract itself which by its terms is not binding on Worldwide until DLS delivers $355,000 to Worldwide (Dkt. 7, Exhibit A). Defendants construe this provision as evidence that the contract was not "entered into in Florida." Further, Defendants submit that there was no expectation that any aspect of the contract was to be performed in Florida, including delivery of the Jeeps.

■ The fact that a foreign defendant contracts with a Florida resident is not enough to establish personal jurisdiction over the foreign defendant. *See Washington Capital Corp. v. Milandco, Ltd., Inc.,* 695 So.2d 838, 841 (Fla. 4th DCA 1997). Defendants do not have an office or an agent in Florida. Additionally, the facts alleged do not support an inference that Defendants operated or conducted a business or business venture in Florida. Accordingly the court does not have personal jurisdiction over Defendants pursuant to Fla. Stat. § 48.193(1)(a).

■ Section 48.193(1)(f) authorizes personal jurisdiction where a non-resident causes injury to a person or property within Florida arising out of an act or an omission by the defendant outside of Florida if (1) the defendant was engaged in solicitation or service activities within Florida, or (2) products, materials or things processed, serviced or manufactured by the defendant anywhere were used or consumed in Florida in the ordinary course of commerce, trade or use. Plaintiff Spiro on behalf of DLS solicited business with Defendants. Additionally, the cause of Plaintiffs' alleged injury was not a product processed, serviced or manufactured by Defendants. Thus, this court does not have personal jurisdiction over Defendants under Fla. Stat. § 48.193(1)(f).

■ Finally, personal jurisdiction is authorized if the non-resident defendant commits a tortious act in Florida. *See* Fla. Stat. § 48.193(1)(b). Committing a tortious act within Florida under Fla. Stat. § 48.193(1)(b) can occur by making telephonic, electronic, or written communications into Florida, provided that the tort alleged arises from such communications. *Wendt v. Horowitz,* 822 So.2d 1252, 1253 (Fla.2002). A defendant's physical presence is not required. *Id.* at 1260. However, the cause of action must arise from the communications. *Id.*

In *Wendt,* an investment broker filed a third party complaint against an out of state attorney and lawfirm alleging that the broker relied to his detriment on legal advice given by the non-resident attorney. *Wendt,* 822 So.2d at 1254. To establish personal jurisdiction, the broker alleged

that the attorney committed a tortious act when he negligently responded in writing to an investigation from the Florida State Division of Securities and negligently drafted loan documents that were the basis of the action against the investment broker. *Id.* at 1255. The attorney moved to dismiss and asserted that he resided in Michigan, was licensed in Michigan, had never been a resident of Florida or solicited or conducted business in Florida, and his contacts with any party or entity in Florida had been on behalf of a client and those contacts had only been telephonic or by mail. *Id.*

The Florida Supreme Court reversed the Fifth District Court of Appeal's holding that the investment broker's allegations did not establish that a tortious act was committed in Florida. *Id.* at 1256. The court remanded for a finding as to whether the causes of action asserted arose from the communications into Florida (the "connexity requirement"). *Id.* at 1260.

If the "connexity" requirement is not met, i.e. the alleged causes of action did not arise out of the communications into the state by the non-resident defendant, personal jurisdiction does not exist over the non-resident defendant. *Carlyle v. Palm Beach Polo Holdings, Inc.,* 842 So.2d 1013, 1017 (Fla. 4th DCA 2003).

Accepting Plaintiffs' allegations as true, pursuant to *Wendt,* it appears that Plaintiffs have alleged sufficient facts to establish personal jurisdiction over Defendants under Fla. Stat. § 48.193(1)(b). Plaintiffs allege that after Spiro's initial inquiry on behalf of DLS to Braswell and Worldwide, numerous telephone calls were exchanged, half of which were initiated by Braswell. During these telephone communications, Defendants allegedly misrepresented to Spiro and DLS that: (1) Defendants were the lawful owners of the Jeeps; (2) Defendants had entered into a settlement agree-

ment with U.S. Customs; and (3) in consideration for the payment of $355,000, Defendants would deliver to DLS and Spiro possession, ownership and control of the Jeeps. These alleged false representations allegedly induced Plaintiffs to enter into the Buy–Sell Agreement which Plaintiffs assert was subsequently breached by Defendants. Moreover, the causes of action asserted appear to arise from the alleged tortious conduct of Defendants. Accordingly, under *Wendt,* Plaintiffs have sufficiently established that the court has personal jurisdiction over Defendants under Fla. Stat. § 48.193(1)(b).

### 2. Due Process Considerations

Since Plaintiffs' allegations establish personal jurisdiction over Defendants under Fla. Stat. § 48.193(1)(b), the court next examines whether exercising personal jurisdiction over Defendants comports with federal due process considerations.

■ Whether personal jurisdiction over a non-resident defendant comports with due process is a two-prong inquiry. *Madara,* 916 F.2d at 1515–16. First, the court must determine whether the non-resident defendant has purposefully established minimum contacts with the forum. Next the court determines whether the exercise of jurisdiction will offend " 'traditional notions of fair play and substantial justice.' " *Francosteel Corp. v. M/V Charm,* 19 F.3d 624, 627 (11th Cir.1994) (quoting *International Shoe Co.,* 326 U.S. at 316, 66 S.Ct. 154).

### a. Minimum Contacts

■ Determining minimum contacts requires evaluation of the "quality and nature" of the non-resident's activity. *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). To constitute minimum contacts for purposes of personal jurisdiction, the defendant's contacts with the applicable forum must: (1) be related

to the plaintiff's cause of action or have given rise to it; (2) involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum, thus invoking the benefit and protection of its laws; and (3) be such that the defendant should reasonably anticipate being haled into court there. *See Vermeulen v. Renault U.S.A., Inc.,* 985 F.2d 1534, 1546 (11th Cir.1993).

A plaintiff properly alleges minimum contacts where he shows that the defendant caused actions to occur in the forum state that create a "substantial connection" with the forum state. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Due process further requires that a non-resident defendant "have 'fair warning' that a particular activity may subject him to the jurisdiction through his own 'purposefully directed' activities at or in the forum." *See Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (citations omitted). The litigation must also "arise out of or relate to" those activities. *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174 (citations omitted).

Additionally, the defendant's conduct and connection with the forum must be of a character that he should reasonably anticipate being haled into court there. *Id.* at 474, 105 S.Ct. 2174. If the defendant's contacts with the forum state are random, fortuitous, or attenuated, the defendant cannot be found to reasonably anticipate being haled into court in the forum. *Madara,* 916 F.2d at 1516 (citations omitted). Additionally, the forum court will not have personal jurisdiction over a defendant where the defendant's contacts with the forum are as a result of the unilateral

activity of a third person. *Id.* (citations omitted).

 Random, attenuated, or fortuitous contact initiated by a Florida plaintiff does not satisfy the minimum contacts requirement. *Sun Bank, N.A. v. E.F. Hutton & Co.,* 926 F.2d 1030, 1034 (11th Cir.1991).

Defendants argue that Plaintiffs' allegations of misrepresentation via telephone and mail communications are insufficient minimum contacts to satisfy constitutional due process, even if sufficient for Florida long-arm jurisdictional purposes. In support Defendants rely on *Sun Bank.*

In *Sun Bank,* several telephone calls between the Florida plaintiff and non-resident defendant in which the defendant allegedly made fraudulent misrepresentations which ultimately caused injury to the plaintiff were not sufficient to qualify as minimum contacts. *Id.* The defendant in *Sun Bank* did not seek out Florida business, did not purposefully direct his activities toward Florida, nor were his contacts as a result of any other activities the defendant initiated in Florida. *Id.* It was the plaintiff that was seeking information on a potential loan who contacted the non-resident defendant who then allegedly made fraudulent misrepresentations. *Id.* The Eleventh Circuit reasoned that it was a matter of chance that the calls originated in Florida, rather than from another state, and that the defendant did not have "minimum contacts" with Florida. *Id.*

Plaintiffs seek to distinguish *Sun Bank* on the basis that no contract existed in *Sun Bank* as it does in the instant case. However, the mere existence of a contract with a Florida plaintiff has never been held dispositive of the issue of personal jurisdiction.[5]

---

**5.** The undersigned determined *supra* that personal jurisdiction exists under Florida's long arm statute, Fla. Stat. § 48.193(1)(b) providing for personal jurisdiction for the commission of a tortious act in Florida. Plaintiffs argue that the court must look at all of the Defendants' contacts with this forum, not only the alleged misrepresentations in the telephone calls, to determine minimum contacts.

■ An individual's contract alone with an out of state defendant does not automatically establish minimum contacts with the individual's home forum. *Burger King*, 471 U.S. at 479, 105 S.Ct. 2174. A contract is ordinarily only an intermediate step serving to tie up prior negotiations with future business transactions. *Id.* Therefore, as the Supreme Court explained, not only does the court examine the alleged contract, if one is alleged, but also the parties' prior negotiations, contemplated future consequences, and the parties' actual course of dealing. *Id.*

■ At oral argument Plaintiffs also argued that the instant case is similar to *Burger King* wherein the Court determined that there were sufficient minimum contacts to subject non-residents to jurisdiction in Florida. *Id.* at 482, 105 S.Ct. 2174. In *Burger King*, the contract between the parties was a twenty year franchise agreement which called for payments to be regularly made to the plaintiff in Florida. *Id.* at 480, 105 S.Ct. 2174. The instant facts alleged by Plaintiffs are distinguishable. Unlike the twenty year franchise contract in *Burger King*, the contract alleged by Plaintiffs was for the isolated sale of Jeeps located in Louisiana. Additionally, unlike *Burger King*, Plaintiffs have not alleged that Defendants did not perform any action required to be performed in Florida. Finally, in comparison to this case, the contract in *Burger King* had a Florida choice of law provision.

Considering the factors identified in *Burger King* as determinative of whether to impose personal jurisdiction, sufficient minimum contacts have not been alleged to subject Defendants to jurisdiction in Florida. First, considering the parties' prior negotiations, it is undisputed that Plaintiffs approached Defendants and solicited the single business transaction for the purchase of Jeeps located in Louisiana that were required by U.S. Customs to be exported outside of the United States. Next, viewing the contemplated future consequences, further action was contemplated in Mississippi where Plaintiffs were required to forward payment and Louisiana where appropriate export documentation was to be presented and storage fees paid. Next, the Buy–Sell Agreement does not contain a venue or choice of law provision. Finally, the parties' actual course of dealing only related to this transaction and Plaintiffs have not alleged any facts to demonstrate that Defendants in the actual course of dealings with Plaintiffs purposefully availed themselves of the privilege of conducting business in Florida.

Defendants also rely on *Green v. USF & G Corp.*, 772 F.Supp. 1258, 1262–63 (S.D.Fla.1991). In *Green*, the contact at issue was a slanderous statement made by a non-resident defendant in a telephone call from Maryland to Florida. *Id.* at 1262. The court found that while the slanderous statement may have been deemed "made in Florida" for long-arm jurisdictional purposes, the non-resident defendant did not purposely avail himself of the benefits available in Florida. *Id.* at 1263.

Defendants argue that their contacts with Florida are due to Plaintiffs' location at the time of the alleged communications. Plaintiff Spiro, on behalf of DLS, initially contacted Defendants. Additionally, all communications by Defendants to DLS and Spiro were made from outside Florida and were in furtherance of the sale of

Drawing all inferences in favor of Plaintiffs, the court therefore considers all alleged contacts of the Defendants with this forum, including the contract. Moreover, the Supreme Court's analysis in *Burger King* for determination of minimum contacts has been applied in cases where the assertion of personal jurisdiction is based on contract and tort. *See e.g. Sun Bank*, 926 F.2d at 1034; *Francosteel*, 19 F.3d at 627–28.

goods housed outside of Florida. Accordingly, Defendants contend that their contacts with Florida were merely fortuitous and do not show that they purposely availed themselves to the jurisdiction of the courts of Florida.

Moreover, Defendants contend that all alleged contacts with Florida are in reality Plaintiffs' unilateral contacts with Florida. A plaintiff's unilateral contacts with the forum state cannot be imputed to the non-resident defendant in order to satisfy the requirement of contact with the forum state. *See Hanson,* 357 U.S. at 253, 78 S.Ct. 1228; *Green,* 772 F.Supp. at 1262.

Plaintiffs respond that, when viewed cumulatively, the Defendants' actions in making false representations to Plaintiffs by telephone while Plaintiffs were in Florida, preparing and forwarding the Buy–Sell Agreement to Plaintiffs in Florida for execution, and delivering the title documents to Plaintiffs in Florida, are sufficient minimum contacts to subject Defendants to personal jurisdiction in Florida. In support, Plaintiffs rely on *Unger v. Publisher Entry Service, Inc.,* 513 So.2d 674 (Fla. 5th DCA 1987).

The *Unger* court found that personal jurisdiction existed over California defendants who entered into a contract in Florida, through a Florida agent, which was to be performed in Florida. *Id.* at 676. However, *Unger* is distinguishable from the instant facts because Plaintiffs have not alleged that Defendants breached an alleged contract by failing to perform an act required under the contract to be performed in Florida. In the instant case, the only act allegedly required to be performed by Defendants in Florida was forwarding Plaintiffs title documents to the Jeeps. Defendants performed; it is undisputed that Defendants forwarded certificates of title to Plaintiffs.

It is Plaintiffs that initiated the contact with Defendants. All of the contacts related to one transaction for the sale of Jeeps located in Texas and/or Louisiana which were to be exported from the United States. It was largely fortuitous that Plaintiffs resided in Florida. Therefore, Plaintiffs' unilateral contacts with Florida should not be imputed to Defendants. This court finds the minimum contacts prong of the due process analysis is not satisfied.

### b. Fair Play and Substantial Justice

■ Even if the minimum contacts requirement were not met, the assertion of personal jurisdiction also does not comport with "fair play and substantial justice." Determining whether "traditional notions of fair play and substantial justice" permit a court to exercise jurisdiction over a non-resident defendant is the last step in the personal jurisdiction analysis. *See Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. This step is conducted separately from the minimum contacts analysis. However, a particularly weighty finding under either the minimum contacts prong or the fair play and substantial justice prong can compensate for a weaker finding on the other prong. *L.O.T.I.,* 907 F.Supp. at 1534 (citing *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)).

Minimum requirements of "fair play and substantial justice" may defeat the reasonableness of asserting personal jurisdiction, even if the defendant purposefully established minimum contacts with the forum to subject the defendant to jurisdiction in the forum's courts. *Madara,* 916 F.2d at 1517 (citations omitted). On the other hand, consideration of the "fair play and substantial justice" factors may establish the reasonableness of jurisdiction where there is a lesser showing of minimum contacts. *Id.*

■ In considering whether a non-resident defendant has sufficient contacts with

a forum state to confer personal jurisdiction, the court considers the following factors: (1) the burden on the defendant in defending the lawsuit; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive social policies. *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174.

Defendants assert that the witnesses and evidence in support of Plaintiffs' causes of action will be located outside of Florida. Therefore, should discovery disputes arise concerning non-party witnesses, they will necessarily involve the federal courts in other states. Thus, Defendants contend it would be a burden on the court and Defendants to adjudicate the merits in Florida. Additionally, Defendants argue that Florida has little interest in this dispute insofar as Defendants contend that the laws of Louisiana and/or Mississippi may control other legal issues such as statute of limitations. Plaintiffs have not countered these arguments.

Worldwide is an inactive Mississippi corporation. Additionally, potential witnesses and evidence may be scattered in Mississippi and Louisiana. The Jeeps were located in Louisiana, and, a significant choice of law issue exists. Considering traditional notions of fair play and substantial justice, it is unfair to subject Mississippi Defendants to the jurisdiction of this court based upon the resident Plaintiffs solicitation of an isolated business transaction for goods located in Louisiana. Other than Plaintiffs' interest in obtaining convenient and effective relief, the other factors are neutral or favor Defendants.

## IV. CONCLUSION

As the undersigned recommends that Defendants' motion to dismiss be granted on the basis that this court lacks personal jurisdiction over Defendants, it is unnecessary to address other issues in Defendants' motion to dismiss or Plaintiffs' motion for partial summary judgment.

Accordingly, upon due consideration, it is hereby **RECOMMENDED** that:

(1) Defendants' motion to dismiss (Dkt.8) be **GRANTED**; and

(2) The remaining motions (Dkt. 34 and 37) be **DENIED** as moot.

### NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal. *See* 28 U.S.C. 636(b)(1).

July 3, 2003.